Eb4zusam                    Motion

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

USA EX REL KESTER, et al.,

                Plaintiffs,

            v.                        11 CV 8196

NOVARTIS PHARMACEUTICALS
CORP.,

                Defendant.

------------------------------x

                                    November 4, 2014
                                    10:15 a.m.

Before:

                    HON. JAMES C. FRANCIS,

                                    Magistrate Judge

                        APPEARANCES

U.S. ATTORNEY'S OFFICE, SDNY
      Attorneys for Plaintiffs
BY:  LI YU   REBECCA
      C. MARTIN

CALIFORNIA ATTORNEY GENERAL'S OFFICE
      Attorneys for Plaintiff State of California
BY:  STEVEN U. ROSS

NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
      Attorneys for Plaintiff State of New York
BY:  CHRISTOPHER Y. MILLER
      DIANA ELKIND

QUINN EMANUEL URQUHART & SULLIVAN LLP
      Attorneys for Defendant
BY:  MANISHA M. SHETH

CRAVATH, SWAINE & MOORE LLP
      Attorneys for Defendant
BY:  RACHEL G. SKAISTIS

Eb4zusam                          Motion

1   APPEARANCES(continued):

2   KAYE SCHOLER LLP
          Attorneys for Defendant
3   BY:  MANVIN S. MAYELL

4             (THE FOLLOWING APPEARING BY WAY OF TELEPHONE:)

5   GEORGIA ATTORNEY GENERAL'S OFFICE
    BY:  ELIZABETH WHITE
6
    OFFICE OF THE ILLINOIS ATTORNEY GENERAL
7   BY:  ELISA CERVANTES HAMILTON

8   OFFICE OF INDIANA ATTORNEY GENERAL
    BY:  LAWRENCE J. CARCARE, II
9
    MARYLAND ATTORNEY GENERAL
10  BY:  JEREMY DYKES

11  OKLAHOMA OFFICE OF ATTORNEY GENERAL
    BY:  CHRISTOPHER P. ROBINSON
12
    WISCONSIN DEPARTMENT OF JUSTICE
13  BY:  KATIE M. WILSON

14  WASHINGTON STATE ATTORNEY GENERAL
    BY:  CARRIE L. BASHAW
15

16

17

18

19

20

21

22

23

24

25

Eb4zusam                          Motion

1          THE DEPUTY CLERK:  All rise.

2          THE COURT:  Good morning.  Please be seated.

3          (case called)

4          MR. ROSS:  Good morning, your Honor, Li Yu for the

5     Federal Government.

6          THE COURT:  Good morning.

7          MS. MARTIN:  Good morning.  Rebecca Martin for the

8     United States.

9          MR. MILLER:  Good morning.  Chris Miller for the State

10    of New York.

11         MR. ROSS:  Good morning, your Honor, Steve Ross on

12    behalf of California.

13         THE COURT:  Good morning.

14         MS. SHETH:  Good morning, your Honor, Manisha Sheth on

15    behalf of Novartis.

16         MS. SKAISTIS:  Your Honor, Rachel Skaistis also on

17    behalf of Novartis.

18         MR. MAYELL:  Your Honor, Manvin Mayell for Novartis as

19    well.

20         THE COURT:  Good morning.

21         And I understand that we have a number of other

22    parties represented on the phone.  I will not ask for your

23    appearances.  I have them here, and we certainly welcome your

24    participation, and ask that when you participate, you identify

25    yourselves before you speak so that we have an accurate record.

1        So thank you all for attending.  I'm looking forward

2   to being illuminated on this, and why don't we start with

3   Novartis.

4        Ms. Sheth.

5        MS. SHETH:  Thank you, your Honor.  May I approach the

6   podium?

7        THE COURT:  Please.

8        MS. SHETH:  Good morning, your Honor.

9        We, as you know, your Honor, Novartis has moved to

10  compel two specific categories of documents.  The first are

11  what we will refer to as adherence documents, and the second

12  are what we will refer to as treatment and therapy protocol

13  documents.

14       There was a third category of documents that was

15  originally included in our motion.  These were the settlement

16  communications related to the stipulation and facts with

17  BioScrip.  Shortly after Novartis filed our motion to compel,

18  the government, including the states, have produced documents

19  related to that third topic.  So that is no longer at issue in

20  the motion.

21       Let me begin by just reiterating the broad standard of

22  relevance which governs Novartis's motion.  Under Rule 26(b), a

23  party is entitled to discovery on any matter that is relevant

24  to a party's claim or defenses.  And the courts in this court

25  have construed Rule 26(b) very broadly to encompass any matter

1    that bears on or that reasonably could lead to other matter

2    that could bear on any issue that is or may be in the case.

3         Now, the discovery that Novartis seeks here, both

4    categories, are relevant to a critical issue in the case;

5    whether Novartis violated the antikickback statute.  And as we

6    will go through both categories, we'll see exactly how those

7    documents are relevant to that central issue in the case.

8         Now let's start with the medication adherence and

9    treatment protocols.  There is medication adherence programs.

10   As a preliminary matter, there is no dispute in this case that

11   the government itself believes that adherence is a good thing.

12   An effective adherence program improves patient care, improves

13   patient outcomes, and avoids adverse health consequences.

14   Moreover, it reduces healthcare cost.  In fact, the cost of

15   medication not adherence were estimated to exceed over $177

16   billion in the year 2000.  So there is no question that the

17   government thinks adherence programs are a good thing, and that

18   the government itself encourages medication adherence by

19   promoting programs such as refill reminders and by encouraging

20   adherence initiatives.  For example, the CMS Star Ratings

21   Program is administered by CMS and provides financial

22   incentives to Medicare Part D sponsors in the form of quality

23   bonus payments that are based on a number of metrics, one of

24   which is the adherence rate among patients.

25        So what documents is Novartis seeking on this topic?

Eb4zusam                          Motion

1    There are basically four categories of documents that we are

2    seeking.  The first --

3            THE COURT:  Before you get there, I think I want to

4    stop at the threshold for a second.

5            I understand the false claim to be that Novartis

6    receives kickbacks for, among other things, encouraging

7    adherence.  And if I understand the antikickback statute

8    correctly, there is essentially a safe harbor for receiving

9    kickbacks or payments, if you will, provided that there is

10   disclosure made; that is, provided that there's transparency,

11   then there's no liability under the Act.

12           If that's correct, why do we care about adherence, the

13   Government's position with respect to adherence?  Isn't the

14   issue simply whether the proper disclosures were made?

15           MS. SHETH:  Actually, your Honor, we would argue the

16   Government's theory is that there is a false claims violation

17   based on a predicate violation of the antikickback statute.

18           THE COURT:  Right.

19           MS. SHETH:  And their theory is that Novartis offered

20   remuneration in exchange for a referral.  So Novartis is

21   offering rebates, discounts which, as your Honor notes, are

22   protected under the safe harbor.  And also they argue that

23   Novartis did patient allocations or offered patient allocations

24   to specialty pharmacies such as BioScrip in this case, to

25   encourage the promotion or recommendations of Novartis's

Eb4zusam                          Motion

1     product, in this case Exjade.  So those two elements, the

2     recommendation and the remuneration are at issue in this case.

3     And the government has alleged that refill programs, or

4     adherence programs more specifically, are improper

5     recommendations.  Because what Novartis was doing, along with

6     BioScrip, was doing programs that were geared not towards

7     patient education and counselling, but rather were geared

8     towards simply pushing their, Novartis's product, Exjade onto

9     patients.  And the issues that are relevant with regard to the

10    Government's own programs will shed light on what does the

11    government think is an appropriate adherence program.  So that

12    discovery will shed light on the contours of what the

13    government views as an appropriate adherence program.

14         THE COURT:  So your view is that the Government's

15    theory is not merely that Novartis is failing to disclose its

16    program, but that its program is substantively illegal.

17         MS. SHETH:  Correct.  And that is their theory, and

18    that is throughout their complaint.  What they're alleging with

19    regard to BioScrip is that Novartis induced BioScrip to act as

20    an agent of Novartis; so basically an agent of Novartis's sales

21    force.  And so the communications and the discovery about the

22    Government's program will show three important characteristics

23    of what the government thinks is an appropriate adherence

24    program.  The first is the scope of appropriate communications

25    with the patient.  The second is what does the government think

Eb4zusam                          Motion

 1   about qualifications and training of the personnel who are

 2   employed to administer the adherence program, and the third,

 3   what are appropriate incentives that should be given to

 4   entities or personnel who are administering adherence programs,

 5   including what is the appropriate metric for measuring

 6   adherence.

 7           So these are, these three components of an adherence

 8   program are directly put into play by the Government's own

 9   allegations in this case.  And what they've alleged with regard

10   to patient communications is that the communications between

11   BioScrip personnel and patients were based on clinical pretext.

12   They were not accurately conveying information to the patients

13   about the medications, about side effects.  One of the central

14   allegations in the Government's complaint is that BioScrip

15   misled patients by unduly emphasizing the need to take Exjade,

16   in terms of complying with the doctor's orders, versus

17   understating the risks in terms of side effects that are

18   present.  And they told -- the allegation is that they told

19   patients to ignore the side effects and continue taking Exjade

20   and to take Exjade as long as possible.

21           THE COURT:  I understand that those are the

22   Government's allegations in the complaint.

23           I'm having trouble, and perhaps you're not the person

24   I should be asking, about linking those allegations to

25   particular legal claims.

Eb4zusam                            Motion

1            MS. SHETH:  Right.  And I think those allegations

2    would go to the element of the antikickback statute that

3    relates to whether or not this was a recommendation.  And if we

4    look at the 1994 fraud alert, for example, which is cited by

5    Judge McMahon in her decision on the motion to dismiss, one of

6    the factors that's considered in that guidance is whether or

7    not the communication was genuine patient counselling or

8    education or was it more akin to what they call, quote unquote,

9    sales-oriented patient counselling and education.  And I think

10   that is a central issue as to whether or not what Novartis was

11   doing here was encouraging a recommendation or merely

12   encouraging patients to take medication that's already been

13   prescribed by their physicians; can that be a recommendation?

14   All they're doing is having patients take medication that's

15   already prescribed by a physician pursuant to a valid

16   prescription.

17            Now, the second thing that the government alleges in

18   its complaint which ties back to what the government views as

19   appropriate adherence is the qualifications of the personnel

20   who are administering the adherence program.  So throughout

21   their complaint the government alleges that BioScrip personnel

22   were not qualified; that they did not have the appropriate

23   training in the disease state of iron overload; that they were

24   not trained on Exjade as a medication, and because they were

25   not trained they should not have been making these patient

Eb4zusam                         Motion

1    outreach calls.

2              Now, what the government does with regard to either

3    its own adherence programs or private programs that it views as

4    good and appropriate adherence programs, is relevant because it

5    goes to what are those qualifications that are necessary, what

6    are those training requirements that are necessary and

7    appropriate to administer an adherence program.

8              And then the third category goes to the incentives;

9    what are appropriate incentives that should be offered to an

10   individual or entity who is encouraging adherence.  And we know

11   that the government itself does encourage making incentives or

12   making payments to individuals for encouraging adherence.  And

13   in this case the allegation is that Novartis offered incentives

14   in the form of rebates, discounts and allocations, patient

15   allocations to encourage adherence.  So the question is is that

16   an improper -- the legal question under the AKS is is that a

17   proper incentive -- is that an improper inducement or is it a

18   proper incentive.  And so Novartis's position is that what it

19   did in terms of patient communications, its training of

20   BioScrip both with regard to the disease state and the

21   medication at issue here, was all proper, and the incentives it

22   offered to BioScrip were proper.  And we believe that the

23   discovery relating to the government programs will confirm and

24   will show that those programs support Novartis's argument, as

25   opposed to the Government's argument, which is that the conduct

Eb4zusam                          Motion

1    was improper and constituted a violation of the antikickback

2    statute.

3         Now, what is the Government's position in response to

4    Novartis's relevance argument?  Well, I think we should start

5    with the states.  Because the states do recognize that this

6    discovery is relevant in part, because the states have agreed

7    to produce a limited subset of these adherence documents that

8    relate specifically to Exjade and that are in the possession of

9    the single state agency.  So the state implicitly, or at least

10   in part, concedes the relevance.  And they, despite making that

11   agreement, however, they have to date failed to produce any

12   such adherence documents.  So we're still waiting for those.

13        But I want to point out that the states' limitations

14   on those two topics are inappropriate.  First, their limitation

15   to just adherence documents that relate to Exjade is too

16   limiting.  Because whether or not a particular practice, such

17   as providing financial incentives to encourage adherence,

18   whether or not that violates the antikickback statute doesn't

19   depend on the drug in question.  Those parameters of what

20   constitutes an appropriate adherence program in terms of

21   patient communication, incentives, what's the appropriate

22   metric to measure adherence, all that isn't going to be drug

23   specific or disease state specific.  And so programs that

24   relate to diabetes drugs or hypertension drugs, the metrics

25   that are used, the communications that are deemed proper, the

1    qualifications that are deemed appropriate, all that will be

2    relevant to informing the fact finder's view that Novartis's

3    conduct here was entirely appropriate and not within the

4    parameters of the antikickback statute.

5                THE COURT:  And if you're wishing to go that far

6    afield, are you prepared to pay for it?

7                MS. SHETH:  Pardon?

8                THE COURT:  Are you prepared to pay for it, for the

9    government to do the search that would obtain that information

10   with respect to every drug?

11               MS. SHETH:  Well, I have to -- I'd have to raise that

12   issue with our client.

13               I mean, generally, the rule is that the government,

14   you know, as a party in this litigation would bear the cost of

15   their own discovery.  I mean, we would argue that it is not

16   terribly burdensome, and that's going to the burdensome

17   argument.

18               The federal government has already produced documents

19   from other agencies, including CMS and HHS and OIG and the FDA.

20   And so we're not asking the government to search every

21   government agency.  I mean, it is limited in two ways; one,

22   with regard to the agencies that would have policy making --

23   health policy making jurisdiction with regard to adherence

24   programs; and, second, to a limited subset of documents that

25   relate to the Government's views on adherence and the sort of

1    adequacy and the efficacy of those programs.

2              THE COURT:  Do you have any reason to believe that the

3    Government's general adherence policies differ drug to drug?

4              MS. SHETH:  We don't know.  I mean, there's very

5    limited information available in the public domain.  And what

6    we've been able to find so far relates to, primarily, two

7    programs.  One was the CMS Star Ratings Program and the second

8    was the Medication Management and Adherence Therapy Programs.

9    And both of these, from what we can tell, appear to be pretty

10   general.  I don't believe that the policies vary from -- based

11   on disease state or by drug.  But generally I think they do

12   pertain generally to the concept of why medication adherence is

13   a good thing and what are the scope and parameters of those

14   programs.

15             The other category of documents that we are looking

16   for, which is actually an important category, is documents that

17   relate to whether or not adherence communications are excluded

18   from marketing communications.  And so part of Novartis's

19   request pertain to rules and guidance that the government has

20   put out that excludes those type of communications from

21   marketing communications.  And although the government is

22   saying no those are not relevant because they are strictly in

23   the context of HPPA and privacy concerns, we do think it is

24   relevant to one of the central issues in this case, which is

25   are what -- is what Novartis doing in this case in terms of

Eb4zusam                              Motion

1    encouraging adherence, encouraging patients to take Exjade as

2    prescribed by their physicians, is that truly marketing

3    activity, as referred to in 1994 fraud alert, or is it more

4    akin to patient education and counselling?  And so that, again,

5    is informative to that underlying issue which is in dispute.

6          The second issue which the states limit their

7    production to is documents that are within -- documents that

8    reflect the states' own adherence programs.  And they're

9    refusing to produce documents that reflect the states' views

10   about private adherence programs.  And for the same reasons we

11   articulated earlier, the relevance of the documents is the

12   same; whether the state is sponsoring the adherence program or

13   whether the state is making a pronouncement on an adherence

14   program that's offered by a private entity.

15         Now, with regard to the United States Attorney's

16   Office, generally they make two arguments against the relevance

17   of these documents.

18         First, they argue that the antikickback statute

19   doesn't apply to the government.  And I think, your Honor, we

20   don't need to address that issue.  I mean that is issue is

21   irrelevant.  Because what we are looking for -- we're not

22   making the argument that the fact that the conduct by the

23   government is not covered by the antikickback statute means

24   that it shouldn't be covered for Novartis.  To the contrary,

25   we're arguing that what the government says about adherence,

1   how it administers its own adherence programs is relevant to

2   Novartis's claim that its conduct here was entirely

3   appropriate.  And so what the government says is appropriate

4   about those three things, patient communications,

5   qualifications and training of folks who are administering the

6   adherence programs and incentives and metrics to measure

7   adherence are entirely what is necessary to look at, whether or

8   not Novartis's conduct here violated the antikickback statute.

9   We say it doesn't, government says it does, and those documents

10  will help inform that decision.

11          The second argument that the federal government makes

12  in opposition is that unless Novartis knew about or relied upon

13  these documents in creating its own adherence program, they're

14  not relevant.  And, again, that takes -- that position takes a

15  very limited view of relevance.  Because under the Government's

16  view, those documents are only relevant to Novartis's intent,

17  and we are arguing that it's much broader than that.  It goes

18  to the heart of what is at dispute in this case, whether or not

19  Novartis violated the antikickback statute.

20          Now the second category of documents that we are

21  seeking are the treatment protocols and therapy documents.  And

22  these primarily relate to three different topics.  The first

23  are documents relating to the Government's views about clinical

24  considerations related to immunosuppressive therapy for kidney

25  transplant patients.  So it's a very limited category of

1   documents pertaining to a very specific therapy for a very

2   specific patient population; second, are documents relating to

3   iron chelation therapy for patients at government hospitals;

4   and then third is actually a response to interrogatory that

5   relates to identifying the health care professionals at

6   government hospitals who are responsible for making prescribing

7   decisions for immunosuppressive therapy.

8           Now why are these documents relevant?  The government

9   has really called into question whether the communication that

10  Novartis was providing to the SPs and the SPs were providing to

11  the physicians was clinically appropriate and accurate, or was

12  it supported or was it simply pretext in an effort to encourage

13  doctors to switch patients from CellCept to Myfortic.  CellCept

14  is the competitor drug to Myfortic.

15          Second, they argue with regard to the Exjade scheme

16  that the information that was provided to patients was not

17  clinically supported and was not accurate and, rather, was just

18  done under the guise of encouraging marketing of Exjade and

19  putting as many patients on Exjade and continuing them to take

20  Exjade for an extended period of time without regard to

21  clinical considerations, including whether it was medically

22  appropriate or medically necessary.

23          So in light of those allegations by the government

24  that what Novartis and what the SPs were doing was simply

25  clinical pretext, these documents are relevant to showing what

1    does the government think?  What do government hospitals, what

2    do the healthcare providers at those hospitals think about the

3    clinical benefits of Myfortic?  What do they think about

4    Exjade?

5            Now, with regard to the Government's complaint, it's

6    actually the fourth step.  They have a multi step scheme

7    outlined in their complaint as to Myfortic.  And the fourth and

8    critical step in their alleged scheme is that Novartis induced

9    specialty pharmacies to improperly influence physicians by

10   providing them with pretextual clinical reasons to switch from

11   CellCept to Myfortic.

12           Now, what Novartis is arguing is that the information

13   that was provided was clinically appropriate.  And what we

14   expect to see is that doctors switched patients from CellCept

15   to Myfortic for a variety of clinically supportive reasons, one

16   of which was the fact that Myfortic had an enterate coating

17   which enabled -- which led to fewer GI complications or fewer

18   GI side effects in patients.  In contrast, CellCept, because of

19   the way that it was metabolized in the body, led to greater GI

20   side effects; second, that there is a known drug-to-drug

21   interaction between CellCept and proton-pump inhibitors, and

22   patients who are taking proton-pump inhibitors had reduced

23   efficacy when they were taking CellCept.  So the proton-pump

24   inhibitor led to a reduction in efficacy when taking CellCept.

25   This often results in patients taking less of the dose that

1    they were supposed to take, led to further GI side effects, and

2    actually even presented problems with adherence to the

3    medication as prescribed by their physicians.

4          And then the third reason, the third clinically

5    supported reason is that some physicians believed that in the

6    context of transplant patients, that it is better to have a

7    branded product instead of a generic product for two reasons;

8    one, bioequivalence concerns.  You could have a generic that

9    has a certain window of bioequivalence, and given that window,

10   it's better to have a known branded product rather than a

11   generic product.

12         And then the second reason was pill confusion.  If

13   there's multiple forms of a generic, patients may get confused

14   because of the appearance of their pill looks different, and

15   that may lead to complications in terms of failing to adhere to

16   their medication.

17         So these are the three reasons that were given by the

18   SPs and the physicians when they are -- that were relied upon

19   by those individuals when making healthcare decisions for their

20   patients.  And the government is claiming those were simply

21   pretext and they were not clinically supported.  And the

22   documents that we are seeking will help show for the Myfortic

23   patients that these actually were valid reasons, and the

24   government itself at its own hospitals viewed these reasons as

25   clinically supported.

1          THE COURT:  Well, are we talking about the adequacy of

2     these reasons generally; that is, that it's true in general

3     that there are fewer GI complications with Myfortic, or are we

4     talking about the communications made with respect to a

5     particular patient?

6          MS. SHETH:  No, and that's a very good question, your

7     Honor.  We're not looking for individual patient specific

8     communications.  And I would agree that would encompass a much

9     broader universe of documents.

10          But what we are looking for are the treatment and

11     protocol documents.  And what I mean by that is that each

12     hospital will have a treatment protocol; that this is the

13     guidance that's used by the hospital and provided to the

14     physicians at that hospital for how do we treat generally

15     immunosuppressive -- how do we treat kidney transplant patients

16     with immunosuppressive agents.  They could be broad and they

17     could say, we generally use immunosuppressive therapy following

18     a kidney transplant; it should be maintained X days after the

19     kidney transplant.  They could be even more specific.  They

20     could say we start with CellCept as the treatment of choice.

21     If the patient experiences GI side effects, we then go to

22     Myfortic.  So it's really a guidance document that is provided

23     at hospitals for its healthcare providers on how to treat

24     patients.  Of course healthcare providers have the discretion

25     to make deviations from that general guidance document, but it

1    shows the overall preference in terms of treatment by that

2    particular hospital.  And what we are seeking are the treatment

3    protocols in place at government hospitals.

4           THE COURT:  Why isn't that a subject of expert

5    testimony; that is I would think you would have an expert who

6    would say this is perfectly appropriate and here's why.

7           MS. SHETH:  It may be the subject of expert testimony,

8    but that expert testimony will certainly carry more weight if

9    the expert is allowed to have the benefit of those documents

10   that the government itself -- I mean, we have a government who

11   is claiming that Novartis's reasons here were clinical pretext.

12   But if the government itself at its own hospitals views these

13   same reasons; the better GI profile, the PPI interaction, the

14   preference for branded medication for kidney transplant

15   patients -- if the government itself believes that there's

16   appropriate reasons to use Myfortic or appropriate reasons to

17   switch a patient from CellCept or generic CellCept to Myfortic,

18   that's certainly relevant to Novartis's defense that these were

19   appropriate clinical reasons.

20          THE COURT:  Have you had any discussions with the

21   government about doing a sample in order to obtain either these

22   particular documents or others on your list?

23          MS. SHETH:  We have not.  We've really hit a roadblock

24   in our meet and confer discussion on the topic of relevance.

25   And so the topic of burden, we've not really been able to make

1   much progress on.  Because once we, you know, have this dispute

2   that between the parties as to whether or not the documents are

3   relevant, we're not really getting to that meet and confer

4   dialogue about, well, are there limited places, certain VA

5   hospitals that we can go to; are there regional centers that

6   perhaps have the authority to implement at the more local VA

7   hospitals.  So I mean I agree with your Honor that there may be

8   ways that we can work with the government on its burden

9   objection, but I think we first need a threshold determination

10  on relevance.

11          THE COURT:  Well, not necessarily.  I'm not sure there

12  is a brightline between relevance and burden.  And if you're

13  sufficiently cooperative with respect to burden, they might be

14  more inclined to waive a relevance argument, at least at this

15  stage.

16          MS. SHETH:  Yeah, and again we are -- I mean, we are

17  willing to work with them.  Just the discussions to date have

18  not been productive on that front.  We hadn't received any

19  proposals for how to narrow the scope of the discovery.

20          So for the same reasons that the Myfortic treatment

21  documents are relevant, it's a very similar argument with

22  regard to the Exjade documents and the documents that relate to

23  iron chelation therapy.

24          Now, in this context the iron chelation therapy

25  documents are relevant to showing what is the appropriate

1   patient population that should get Exjade to treat iron

2   overload; what is the appropriate iron level in patients' blood

3   that would warrant taking Exjade; how long should the patients

4   stay on Exjade; how should it be administered; should it be

5   administered on an as-needed basis as the government alleges or

6   should it be administered continuously pursuant to a valid

7   prescription by a physician?  So these are all issues that

8   again would be in the treatment protocol documents relating to

9   iron chelation therapy at government hospitals.  And again this

10  is put into dispute by the Government's own complaints.  If you

11  look at the Government's complaint, they describe the Exjade

12  refill, the Exjade scheme as a refill scheme.  Basically,

13  they're saying that the specialty pharmacies completely

14  abdicated their clinical judgment and just were simply pushing

15  Exjade on patients with regard -- without regard to whether it

16  was clinically appropriate or medically necessary, and they're

17  pushing patients on Exjade who don't need it.  And, worse,

18  they're alleging that the specialty pharmacies are putting

19  patients on Exjade despite a doctor saying, okay, you're

20  experiencing XYZ side effects, I'm going to take you off

21  Exjade.  So these are all questions or allegation that the

22  government has really put into play when they're describing the

23  scheme in this case.  And the discovery relating to the iron

24  chelation therapy documents will reflect the Government's views

25  about what is appropriate and what's an appropriate clinical

1    reason to put a patient and continue a patient on Exjade.

2         Now, the government relies heavily on Judge McMahon's

3    decision on the motion to dismiss to argue that these documents

4    are not relevant.  But it's important to remember two things

5    about that decision.  First, it was on a very narrow legal

6    issue relating to the sufficiency of the Government's

7    allegations with regard to the causation element.  So it's a

8    specific element under the False Claims Act that was at issue

9    in those motions.

10        And, second, and perhaps most importantly, that motion

11   was on a motion to dismiss, and the Court was bound to accept

12   the allegations in the complaint as true.  And the key

13   allegation which the Judge accepted as true was that there was

14   a kickback, that there was a violation of the antikickback

15   statute.  So that part of the motion to dismiss was just

16   accepted as true because it was a motion to dismiss.  And here

17   we are arguing that this requested discovery on both fronts,

18   the adherence documents, as well as the transplant -- excuse

19   me -- as well as the treatment documents, are related to

20   whether or not there was a violation of the antikickback

21   statute.  And it's relevant to whether the claim that the

22   information given was clinical pretext or whether it was

23   clinically supported, and it's relevant to whether or not the

24   conduct was genuine patient education and counselling, or was

25   it inappropriate, quote unquote, sales-oriented activities and

Eb4zusam                          Motion

1    promotion.

2              And so these documents are relevant to establishing

3    that Novartis's defense, which is its conduct here was entirely

4    appropriate.

5              Now, the government also raises several other non-

6    relevance type objections, which I can cover now or in rebuttal

7    if your Honor would prefer.

8              THE COURT:  Go right ahead.

9              MS. SHETH:  Okay.  Thank you, your Honor.

10             The first argument is that this is a fishing

11   expedition by Novartis, and I would strongly disagree with

12   that.  Because we have in our discovery request identified the

13   specific programs that we were able to find just from a public

14   search using the internet.  And we've identified the specific

15   agency within the government who we believe would have relevant

16   documents.  And one of the important points to note -- it's

17   actually in response to their burden argument -- is that we're

18   not asking -- and this primarily applies to the states -- that

19   we're not asking that they search every single state entity

20   within the rubric or umbrella of the state government.  But it

21   is limited to agencies that have some responsibility over

22   healthcare policy, particularly adherence policy, and adherence

23   initiatives.

24             Second, it's a very limited subset of documents that

25   pertains to adherence initiatives, the Government's views on

Eb4zusam                        Motion

1   adherence initiatives, and issues relating to whether something

2   is -- whether marketing is, excuse me, whether adherence

3   initiative are excluded from marketing activities.

4           And then the second argument they make -- the federal

5   government actually makes this argument more so than the

6   states -- is that because the government views its adherence

7   programs as substantially different than what Novartis was

8   doing in this case or alleged to have been doing in this case,

9   the discovery is not relevant. And I think that argument, sort

10  of that self proclaimed proposition doesn't really work here.

11  Because if that's the position of the federal government, we

12  need those documents to test that assertion, that these

13  adherence programs sponsored by the government are vastly

14  different than the adherence program that's at issue in this

15  case. So I don't think it's appropriate for them to simply say

16  that we're not going to produce documents because the two

17  programs are vastly different.

18          And then again, as your Honor noted, the burden

19  argument is also heavily relied on both by the federal

20  government and the states. And here there has been, to date,

21  no factual support that the government has provided in support

22  of their burden objections. And the case law in this Court is

23  clear that a party, including the government, cannot rely on

24  generalized claims of burden to avoid producing documents.

25  They have to come forward with specific facts that support its

Eb4zusam                          Motion

1    burden objections.  And here, given the very narrow categories

2    of documents that we are seeking on both categories, we think

3    there is not merit to -- there is no merit to the Government's

4    argument on burden.  And we're also limiting it to certain

5    specific agencies within the government that have

6    responsibility over these two categories of documents.

7            And the other point I would make with regard to the

8    burden argument is that we received very little discovery to

9    date from the states particularly.  All the -- three of the 11

10   states who are plaintiffs in this action have produced only

11   claims data.  So we've not received any other documents from

12   all the three of the states.

13           And with regard to the remaining three states, New

14   York, for example, has produced a mere 117 pages of documents

15   in addition to their claims data.  Wisconsin has produced 570

16   pages of documents.  And so we're not, you know, we're not in a

17   situation where the government has produced so many documents

18   and we continue to ask them to produce more documents and more

19   documents for no reason.  These are clearly relevant documents

20   that go to the heart of the issue, whether or not there has

21   been an antikickback violation in this case.

22           Now the last argument that the states make is that

23   they are not in custody or control -- possession, custody and

24   control of the documents.  And their first argument on that

25   point is that it is the SSA, the single state agencies, not the

Eb4zusam                          Motion

1    states who are the plaintiff in this case.  And we would

2    disagree with that.  Because the real party, if we look at the

3    complaint, the party who's named in the caption is the state.

4    The state is arguing, well, no, it's actually the SSAs because

5    the SSAs is the party who incurred the damages and that's who

6    will get any recovery, to the extent there is a recovery.

7            But again that misses two points.  The first is that

8    is the test of production of documents has always been -- the

9    real party in interest is not the party who suffered the

10   damages, but rather who is the party who brought the case, who

11   is the party that has possession custody and control of the

12   documents.  So that argument by the State is not supported by

13   the case law.

14           And if we actually look at the Government's state

15   complaints, each of them alleges that in the damages section

16   that it is the state who has suffered damages here, not the

17   SSAs.  But even accepting for a moment that the SSAs are the

18   true party in interest, we have to look at the regulations and

19   the statutes which show that the SSAs each do have the

20   practical ability to get these documents.  The SSAs have

21   control over the documents of state agencies, as well as state

22   run hospitals who are involved in the administration of

23   Medicaid -- of the Medicaid program or that provide Medicaid

24   services.  And although the states argue that this should be

25   limited to -- the states are limited in their authority to

Eb4zusam                         Motion

1    entities over whom they conduct audits, that's not what the

2    regulations say.  Actually the states have authority over

3    anyone, any Medicaid provider who is involved in the

4    administration of the Medicaid program.  And to be clear, we

5    are not asking states to go out to every individual healthcare

6    provider who is a Medicaid provider; but, rather, we're talking

7    about the state entities who are charged with administering the

8    Medicaid program.  So it's not as burdensome as they would like

9    to make it out.

10         THE COURT:  Well, but your legal argument would

11   logically lead to that result, would it not?  Your position is

12   that the regulations dictate possession, custody and control,

13   and that gives them audit capabilities over the individual

14   providers.

15         MS. SHETH:  According to -- I mean, that's probably

16   literally how the regulation reads.  But I think what we are

17   seeking here, those documents -- well, first of all, the

18   adherence documents generally won't be at the individual

19   healthcare providers because those are going to be more policy

20   adherence initiative type documents.  Those are going to be at

21   the state entity level.

22         And then as to the treatment protocol documents, we're

23   not looking for individual patient records on why particular

24   patients -- what was in the thought process of healthcare

25   providers for individual patients, but rather more generally

```
 1    what is the guidance that's given at these government run

 2    hospitals.

 3              THE COURT:  Thank you.

 4              MS. SHETH:  Thank you, your Honor.

 5              MR. YU:  Good morning, your Honor.  Li Yu for the

 6    government.

 7              THE COURT:  Good morning.

 8              MR. YU:  Let me start by going to an issue of where we

 9    are in this case today because Novartis just has just -- it's

10    plain in its view what has been decided and what has not been

11    decided by the district court on the motion to dismiss.  And I

12    think I do want to start by kind of going back to that point.

13    You know, in the decision, in her decisions Judge McMahon did

14    decide a question of what constitutes antikickback violations

15    in this case, and that's very important.  Because ultimately

16    that is a question that Novartis purports to seek discovery in

17    this instance and that, you know, any relevance or non-

18    relevance documents has to be evaluated based on the legal

19    standard of what is an antikickback statute violation and what

20    is not.

21              So what the antikickback statute itself prohibits a

22    party like Novartis for giving remuneration to another person,

23    including pharmacies in order to induce the pharmacies to

24    recommend their products.  And so each of those terms which

25    Novartis -- you know, Ms. Sheth had mentioned recommendation,
```

Eb4zusam                          Motion

1   inducement, remuneration, all of those are defined within the

2   statute itself.  And so ultimately those, what those words mean

3   and how, what they mean in the context of this case is now

4   being driven ultimately by what some government official may

5   see, may think in the context of some program, ultimately those

6   are words that have commonly and well accepted meaning.  And in

7   the context of construing them, the Court will construe them

8   based on, based on what the words mean and based on precedents

9   dealing with those terms.

10          And so as a starting point Novartis, what Novartis is

11  arguing which is, you know, somehow the government, how the

12  government views a given adherence program is somehow binding

13  or relevant to the question of whether or not there has been a

14  kickback statute violation.  So that point we disagree with.

15  So now --

16          THE COURT:  Let me stop you there for a second.  Is

17  the upshot of that argument that you could bring an action

18  based on the False Claims Act against Novartis based on

19  adherence program that is identical to the one that the

20  government operates?

21          MR. YU:  Well, your Honor, I mean there are a couple

22  basic points.  One which is -- I mean the government cannot --

23  I mean, as much as Novartis claims or argues there are strong

24  similarities between what Novartis is doing and what the

25  government does, I mean there are realy no similarities.

1    Because the government, unlike Novartis, is not a drug maker.

2    So while Novartis here is the party that makes the drugs and

3    distributes the drugs and the government is either a payor in

4    the case of Medicare, or it has no service provider in some

5    cases.  So there are some very fundamental differences in terms

6    of how parties are situated.

7            And moving even beyond that, I mean the government

8    itself is very differently situated from Novartis.  The

9    government as a sovereign is not, itself, subject to the

10   antikickback statute anyway, nor does the antikickback statute

11   have any exception as, you know, if there is a similar

12   government conduct, then Novartis a, private party could

13   somehow find its conduct exempted simply because its conduct is

14   similar to the Government's conduct.  I mean, and here

15   especially where Novartis could have -- where Novartis -- if

16   they had argued or if they had made its point maybe some way

17   relevant would be, if they had based or modeled or relied on

18   some part of government conduct or something the government did

19   in terms of what it's doing here, you know, I mean we don't

20   think that's relevant, but at least I think that would be, you

21   know, there would be some argument about its knowledge of what

22   the government is doing or how the Government's operating its

23   programs that may be relevant to their intent, Novartis's

24   intent at the time it did what it did.  But here Novartis

25   actually as it said on page ten of their opening brief, that it

1    has not modeled its conduct on any government programs.  And so

2    the idea that, that the government may offer some program,

3    operates some program that Novartis that may be certain

4    respects or Novartis may argue that it's similar to what it is

5    doing, or what it was doing, that ultimately, while that could

6    have -- they could have argued that that was relevant to their

7    intent or their knowledge, in fact, you know, that issue is

8    not -- that question is not at issue here.

9              THE COURT:  I think you just answered my question yes,

10    which is that the government does take the position that it can

11    go after Novartis for conduct that is identical to that which

12    the government is engaged in because the government is not

13    subject to the antikickback statute.

14              MR. YU:  Yes, your Honor.

15              THE COURT:  Okay.

16              MR. YU:  I mean, not only is the government itself not

17    subject to any kickback statute, also the statute doesn't have

18    any exception or any safe harbor saying that exempts private

19    parties from liability for similar government conduct or some

20    type of protection like that.  I mean, so here neither of them

21    applies here.

22              THE COURT:  Let's assume that to be the case.  So the

23    information that Novartis is requesting would not be relevant

24    for the antikickback claim, why would it not be relevant for

25    the other claims, the common law claims at least in the state

1    complaints, unjust enrichment, for example?

2              MR. YU:  Well, I mean, your Honor, for both -- well,

3    both the unjust enrichment and the False Claims Act claim are

4    based on the same underlying violation.  The Government's

5    argument is basically that -- the government claims really has

6    two parts or the government claims would have two parts to it.

7    There is, basically, the underlying issue is Novartis violated

8    the antikickback statute.  That gave rise to falsity, and that

9    falsity resulted in false claims.  Some of the government has

10   claims under the False Claims Act which provides statutory

11   damages and penalties, but also has common law claims.  So in

12   this case -- I mean so what Novartis is asking, why it wants

13   discovery is to attack the underlying claim or whether or not

14   engaged in underlying violation.  And so the same standard of

15   relevance governs whether or not the underlying violation

16   occurred or didn't occur, whether or not, you know, the

17   government is seeking remedies under the False Claims Act by

18   statute or by common law through unjust enrichment or, you

19   know, unjust enrichment as to Novartis.

20             THE COURT:  Are you suggesting that the Government's

21   unjust enrichment claim is co-extensive with the antikickback

22   claim -- False Claims Act claim?

23             MR. YU:  Well, your Honor, I mean they have the same

24   underlying premise which is, you know, the government has been

25   injured whether it's, you know, by way of statutory injury or

1   in this case by way of a common law injury.  Because there has

2   been -- the government has been -- paid out money or has given

3   people money based on a false representation or false

4   certification.  The false certification in this case is what

5   is -- these claims are part of a relationship that complies

6   with the antikickback statute.  And so the Government's claims,

7   whether it's under common law or under the False Claims Act,

8   all arise from the underlying antikickback statute violation.

9        THE COURT:  I guess my question is because unjust

10  enrichment involves a balancing of the equities, which is not

11  something necessarily we have to do under the False Claims Act,

12  wouldn't the Government's conduct become relevant in conducting

13  that balance?

14        MR. YU:  Well, I mean I think, your Honor, in this

15  case, it's not an issue that has been squarely raised, and so

16  we can certainly, you know, look further into that.  But, you

17  know, standing here I think the answer is the Government's -- I

18  mean, the Government's conduct doesn't -- because -- I mean,

19  the government has been -- Novartis has been unjustly enriched

20  if, you know, there is a conclusion that it has been unjustly

21  enriched because its conduct violated the antikickback statute

22  and caused false claims to be paid out.  And because the

23  government and Novartis are fundamentally differently situated

24  under the antikickback statute.  So because the government

25  itself is not subject to this statute, so how the government,

1   you know, so how the government structures its affairs and

2   conducts its programs doesn't really go to the question of any

3   private parties compliance or noncompliance with the

4   antikickback statute.  So I don't think that the fact the

5   government, even if it were true -- which it wouldn't be true

6   because the government is so fundamentally different situated

7   from a drug maker like Novartis, even if it were true that

8   these programs are -- have great similarities or even

9   identical, that still wouldn't really affect I don't think

10  through the equities balance analyses as part of the unjust

11  enrichment claim.

12          THE COURT:  Let's go back to a second to the False

13  Claims Act claims.  I asked Ms. Sheth a question about the

14  scope of the Government's claim there, and she suggested to me

15  that it's much broader than I had opined.  Perhaps you can

16  outline for me exactly what the Government's claim is and how

17  broadly it ranges.

18          MR. YU:  Yes, your Honor.  So I mean the government,

19  part of this is based on two decisions that Judge McMahon

20  issued as part of the response to Novartis's two motions to

21  dismiss.  So the government -- there are basically, again,

22  there are two aspects or two parts to the Government's False

23  Claims Act claim.  There is the underlying violation which is

24  the, which is a series of relationships between Novartis and

25  pharmacies.  Novartis and pharmacies violated antikickback

statute, Novartis, they violated the antikickback statute

because Novartis offered and give remuneration in this case,

patient referrals and rebates in the Exjade scheme and the

rebates in the Myfortic scheme to the pharmacies.  And the

pharmacies agreed in return for those types of remuneration to

make recommendations in favor of Novartis's drugs.  And here,

your Honor, I just want to make one point, which is --

THE COURT:  Let me stop you there, because I think I'm

at a point where I need additional information.  Is it part of

your claim that the decision the pharmacies were making and the

advice that they were giving to patients in terms of adherence

programs or whatever, were not clinically indicated?

MR. YU:  No, your Honor, that is not an aspect of the

government -- that's not an element of the Government's claim

here.  This is fundamentally not a case -- it's not a medical

malpractice case and it's not a case where we are arguing

that -- this kind of goes into the second part of False Claims

Act case which is we're not arguing that the claims in this

case are false because they're not clinically indicated or the

drugs were not medically necessary.  So there are cases like

those, but this case is not -- this is not that type of case.

Here the claims were false, and Judge McMahon decided

this, you know, every single claim within the context of the

relationship that was a kickback relationship was false,

because the relationship itself was what violated the

1    antikickback statute and that, in turn, led to certain

2    certifications, and so that gave rise to falsity.  But in this

3    case the Government's claims A, are not limited to instances

4    where the drugs were medically not necessary or not clinically

5    indicated and, two, that's not an essential element of the

6    Government's claim.  I mean, you know, let me if your Honor if

7    I may just kind of walk -- Novartis in its argument does raise

8    this issue and say, well, the government's complaint talks

9    about the questions of clinical independence versus, or the

10   government complaints talk about recommendations being made in

11   a way that's not independent, that doesn't reflect independent

12   clinical judgment.  And there what we're talking about is not

13   whether or not in some objective way, you know, whether an

14   expert would say oh, well, that recommendation is medically

15   appropriate that recommendation is not medically appropriate,

16   but it really the question is was the recommendation, whether

17   it's right or wrong, induced; was it something that was in part

18   motivated by the financial considerations that Novartis

19   injected into its relationship with the pharmacies.

20        Your Honor, one example would be paragraphs 151 to 160

21   in the Government's most recent complaint where it talks about

22   a relationship Novartis had with a pharmacy called Bryant's.

23   So the relationship started with Novartis offering Bryant's

24   rebates, and we allege in exchange Bryant's agreed to recommend

25   Myfortic and to move patients from a competitive drug to

Eb4zusam                        Motion

1   Myfortic.  So this happened for a period of time.  And then

2   generic competitor to Myfortic came to market.  So initially as

3   the rebates continued to flow from the Novartis to Bryant's,

4   the owner of Bryant's was happy to keep his patients on

5   Myfortic.  He argued that it was important that patients -- in

6   fact one of the arguments counsel made here, it was important

7   for patients to keep staying on Myfortic because there is no

8   clinically -- there is a benefit of continuing the same

9   therapy.  Lo and behold, you know, as the situation -- as more

10   patients started using generic rather than the brand name

11   drugs, the amount of rebates going from Novartis to Bryant

12   under their preexisting arrangement began to ebb so there was

13   basically went from torrent to a dribble, and at that point the

14   owner of Bryant told Novartis look, you know, this isn't

15   working, I'm going to go ahead and recommend other patients

16   switch over from Myfortic to the generic.  And Novartis's

17   response to that -- we really want you to keep these patients

18   on Myfortic, so we'll actually rework the terms of our

19   arrangement and retroactively rework their arrangement.  And

20   going forward again the owner of Bryant kept arguing that

21   patients should stay on Myfortic rather than switching to

22   generic or using a competitor drug.

23          And so in this case, so that kind of illustrates a

24   basic point, which is what is problematic, what is the

25   violation of the antikickback statute is not because the

Eb4zusam                        Motion

1   government believes generic is better than Myfortic, or because

2   Myfortic is better than generic.  No, that's not really our

3   issue.  The issue we are concerned with is the way that

4   financial considerations drove or at least factored into the

5   decision that the pharmacy made.  The pharmacies -- whether

6   Myfortic is better or whether generic is better, I mean, there

7   can be debate about that.  But what is clear, one cannot be

8   better than the other if the pharmacist happened to be getting

9   more money from Novartis, and then the pharmacy is getting less

10  money, then the other one became a better drug.  So

11  fundamentally it's not a of based on objective standard, you

12  know, which recommendation was more appropriate.  It's rather

13  the question of whether or not the financial considerations

14  Novartis brought into the relationship, put into the

15  relationship factored into the pharmacist's judgment.  And that

16  ultimately doesn't really depend on the question of whether or

17  not a given recommendation is facially valid in some way.

18  Novartis may very well decide to offer testimony or offer

19  evidence through an expert that this is relevant.  We disagree.

20  But fundamentally we don't think it's relevant because what

21  matters for the antikickback statute is whether or not the

22  recommendation, which has a commonly accepted well understood

23  meaning, and in fact Judge McMahon has already opined on this

24  page 34 of her May decision, whether their recommendation was

25  induced, whether it was motivated in some way by the financial

Eb4zusam                              Motion

1    relationship between Novartis and the pharmacy.

2             Your Honor, and the same argument applies to -- again

3    applies to the Government's allegations about the Exjade

4    relationship.  You know, there the government, as counsel

5    pointed out, the Government's complaint describes how

6    Novartis's relationship with BioScrip or how the types of

7    benefits that Novartis offered to BioScrip created a situation

8    where BioScrip structured its refill program such that the

9    program was focused not on patient care, but instead on the

10   question getting more refill orders.  And, again, there

11   Novartis makes the argument, well, we don't know what the

12   recommendation is.  I mean, we let you know on this point there

13   is a pretty clear definition of recommendation.  Miriam

14   Webster, for example, says a recommendation is to saying

15   something -- saying that something is good and deserve to be

16   chosen.  And in this, in the context of Exjade what was

17   happening from Novartis's perspective, what led to the scheme

18   was Novartis knew that a number of many patients were, for

19   variety of reasons not ordering refills.  So there was a

20   decision that patient had to make, were they going to order a

21   refill or not going to order refill.  And when Novartis through

22   its relationship with BioScrip, you know, motivated BioScrip to

23   do with these incentives is for BioScrip to have its people

24   tell, advise patients that they should order, they should order

25   refills.  So that, you know, very clearly is a recommendation.

Eb4zusam                              Motion

1    Novartis doesn't need to go to the Government's files or go

2    elsewhere to decide or to understand whether or not telling or

3    advising someone who maybe was reluctant to order something

4    that it should do it, they should go ahead and choose to order

5    a refill whether that constitute a recommendation.

6           THE COURT:  And it's your position that it's not

7    pertinent whether or not it was a good idea to make that

8    recommendation?

9           MR. YU:  Your Honor, right.  Again, whether or not, by

10   some objective measure that recommendation was clinically

11   appropriate or medically appropriate is -- that is ultimately

12   not relevant.  You know, what is relevant is what Novartis and

13   the pharmacy, in this case BioScrip, they understood -- what

14   they understood their relationship to be and what Novartis

15   understood BioScrip to be offering to Novartis, would be doing

16   for Novartis in return for these benefits.  I mean, the

17   government, just to be clear, the government does have

18   allegations that talk -- that describe and that go to the

19   nature of how BioScrip operated its program.  But that's

20   really -- I mean, those allegations really ultimately go to the

21   question of motive and intent and Novartis's argument about

22   wilfulness.  Because the allegations show is on one hand

23   Novartis and BioScrip were telling the world, were telling

24   their patients, telling prescribers that what they were doing

25   was a patient center program, patient focus program.  And what

1    in fact they were doing was as the evidence will show is they

2    were focused on getting as many orders, shipments out the door

3    as possible so that Novartis in its own word, its own words

4    could meet its national sales target.  So, again, so the

5    question is not whether or not a particular piece of advice was

6    medically right or medically wrong, but instead the question is

7    was Novartis motivating BioScrip to do something that was

8    consistent with BioScrip's responsibility towards patient care

9    or was Novartis basically, basically subverting that,

10   subverting the pharmacy's responsibility and make pharmacy

11   focus on, you know, focusing on the target and Novartis set for

12   the pharmacy in terms of numbers of orders and numbers of

13   shipments.

14        THE COURT:  Well, why is that important?  Even if

15   BioScrip was going to act in precisely the same manner that it

16   did before or after it received remuneration, isn't it your

17   position that it would still be an antikickback violation?

18        MR. YU:  Your Honor, I mean I think certainly, the

19   Court, Judge McMahon did in fact -- sorry -- did decide that

20   even if there are no steps taken in furtherance of an illegal

21   agreement, that could still be a violation.  So, you know, on

22   one level all that needs to happen is there has to be a legal

23   agreement.  But in this case our allegation, as you say, do

24   indicate that BioScrip did in fact take steps and did make

25   recommendations.  This was not simply an inchoate scheme.  The

Eb4zusam                          Motion

1    scheme did progress over a number of years, and during that

2    time BioScrip did make recommendations being motivated by the

3    financial considerations.

4         THE COURT:  I guess my question really goes to

5    causation; that is, that those the steps that it took, do you

6    have to prove that the steps that it took were different than

7    the steps that would have taken had it not been remunerated;

8    that is, that it would have given different advice?

9         MR. YU:  Your Honor, we don't have to -- that's not an

10   element we have to prove because Judge McMahon in fact decided

11   this question of whether or not a scheme has to succeed in

12   order for there to be antikickback violation.  She said very

13   clearly that it's the illegal arrangement or it's the kickback

14   arrangement itself that constitutes the antikickback statute

15   violation, and not a success of the scheme.  So, in fact, the

16   government doesn't have a burden in this case to prove that the

17   scheme succeeded.

18        Your Honor, let me sort go back, just go back and

19   address the adherence point, and I'll touch on some of the

20   burden points that were discussed earlier as well.

21        So on the adherence point, it's logically -- we've

22   already -- I've already discussed some of these with the Court.

23   The adherence point, Novartis posits that it needs to have

24   Government's view about what constitutes a recommendation, what

25   constitutes proper versus improper incentives, and what

1    constitutes adequate or inadequate training.  You know, first

2    of all, what constitutes recommendation?  As I mentioned

3    earlier, I mean, that's ultimately a legal question.  The word

4    recommending appears in the statute itself, and we believe

5    Judge McMahon has already opined on the question in the context

6    of the two schemes, what constitute or doesn't constitute --

7    what constitutes and doesn't constitute recommendation.  So for

8    Novartis to now try to go through the Government's files and

9    try to dig up the Government's view, we don't just don't

10   believe it's ultimately relevant.

11          Secondly, as far as proper and improper incentives,

12   again, in terms, you know, the statute itself defines what

13   remuneration is and defines what inducement or relevant between

14   remuneration and recommendation through abuse.  So those are

15   all legal questions, you know, that are going to be answered by

16   the Court.  Whether the government views them one way or

17   another in the context of some unrelated program is really not

18   relevant here.

19          And finally the question of metrics.  Again, the

20   government is not suing Novartis because, you know, we assert

21   that by some objective measure Novartis used the wrong metric.

22   I mean this ultimately, this is not case about malpractice

23   about Novartis did something that was inconsistent with some

24   type of standard of care.  I mean, this is case is

25   fundamentally about the way in which Novartis structured its

1   relationship.  And I mean Novartis says it needs documents from

2   the government to know whether or not the way it operated the

3   Exjade scheme was sales oriented or not.  I mean, I really

4   think that's really kind of a red herring.  I mean here we have

5   Novartis document very clearly say that -- this is discussed in

6   the complaint, I believe page, paragraphs 279 to 296 where

7   Novartis documents very clearly say they were basing the

8   incentives, they were offering BioScrip on whether BioScrip

9   helped Novartis fulfill their national sales target.  I mean,

10  the idea that somehow Novartis having said that in its own

11  documents somehow needs to go to the Government's files and

12  look through those files to understand whether or not what

13  happened here were sales oriented or not sales oriented, I mean

14  we really don't think that carries water.  And ultimately it's

15  just irrelevant to the question of whether the relationship

16  constituted the kind of inducement relationship that's

17  prohibited under the antikickback statute.

18          And, finally, on the question, your Honor, of burden.

19  I mean, here -- I mean, because of all the information that's

20  publicly available and so -- I mean, because the government

21  operates in the public, it's not a private company, that's

22  somehow hiding this information so, you know, perhaps we could

23  have done more or could have done more in terms of explaining

24  the burden.  But just give one statistics -- I mean Novartis,

25  among other things, asks in one of its requests for adherence

Eb4zusam                         Motion

1   programs or other similar type of initiatives across all of the

2   VA healthcare facilities.  There are 151 medical centers that

3   are operated by the VA across the country, and on top of that

4   you have some I think approximately 830 outpatient clinics.  So

5   the total volume or the total sources of information that

6   Novartis is seeking here is very very broad and it's very very,

7   very very sweeping.  And so certainly that type of discovery

8   request, Novartis hasn't justified by way of any type of

9   prejudice.  I mean Novartis -- earlier Ms. Sheth has noted

10  before the general principles about scope of discovery.  But

11  ultimately there are some serious -- we don't think any of this

12  request is -- any of the requests Novartis has made are

13  ultimately relevant.  And certainly in this context Novartis

14  hasn't cited to any case or any authority from a False Claims

15  Act case or from a kickback case where a court has permitted

16  this type of sweeping discovery into all types of government

17  programs, government initiatives, government -- and government

18  protocols.  We think there is a good reason for that, which is

19  I mean because in a case like this the government, by virtue of

20  being a fundamentally differently situated from the private

21  defendant, those type of discoveries is ultimately irrelevant.

22  And by virtue of the size of the government and programs it

23  operates are highly burdensome.  And so it's not surprising

24  that there is no authority that Novartis can point to.  And for

25  Novartis to ask the Court here to require the government to

Eb4zusam                          Motion

1    respond to these irrelevant discovery requests, we think is

2    really -- it's, again, itself unprecedented and really cuts

3    against the concept of relevance and also cuts against the

4    basic elements of the claims of defenses that are at issue

5    here.

6              THE COURT:  Thank you.

7              MR. YU:  Thank you.

8              THE COURT:  Who shall I hear from from the states

9    first?

10             MR. MILLER:  Good morning, your Honor, Chris Miller

11   from the Office of the Attorney General of the state of New

12   York.

13             I won't repeat everything that Mr. Yu said.  I want to

14   start, however, with the concept of discovery needing to be

15   relevant to claims and defenses in an action.

16             In this case, as Ms. Sheth said, it needs to be

17   relevant to one of those two things.

18             And with respect to the antikickback statute, I don't

19   think the discovery that's sought here which, for instance, in

20   the case of Novartis requests asks for the views of state

21   government officials about adherence programs is relevant.  The

22   laws and statutes, laws and regulations and other official

23   pronouncements is not in the musings of state government

24   officials in their power points or in their e-mails.  In one of

25   the exhibits attached to Novartis's papers, for instance, there

Eb4zusam                          Motion

1   is a power point in which there is a discussion of providing

2   incentives to prescribers in order to use e-prescribing as

3   opposed to faxing prescriptions, and how that would reduce

4   mistakes.  And there is an off handed comment about how that

5   may also promote adherence.  That is not a statement on the

6   law.  That is not something that Novartis needs to take

7   discovery of to understand what its obligations are in this

8   case.  That is forcing us to go through our files to find every

9   reference to adherence and produce it to Novartis.  And it

10  doesn't matter what someone says in the power point slide

11  internally, and it certainly has no bearing on Novartis's state

12  of mind, which is the other principal argument that I think

13  they raised in their initial papers.

14          I agree with a lot of what Mr. Yu said so I won't go

15  through everything else.  I will say that, you know, we

16  certainly did agree to produce some documents in the spirit of

17  compromise concerning Exjade and adherence programs from our

18  single state agency.  We did not make the concession that

19  Novartis stated that we made it earlier today.  And I think

20  that, you know, we've heard today some things that we frankly

21  hadn't heard before.  There are a list of state agencies in the

22  discovery request from which they wanted discovery, but the

23  request themselves, the wording of them was not in any way so

24  limited.  So we would have to go to every agency.  It's nice

25  there's some willingness to focus on policy making functions.

Eb4zusam                              Motion

1    But I would say that I think we've gotten there already from

2    the state perspective; in other words, our interest in this

3    case concerns the state Medicaid programs, and we are producing

4    documents from the policy maker for the state Medicaid programs

5    concerning Exjade and adherence programs.  So, you know, I

6    think we've come up with a reasonable compromise and the Court

7    should accept that compromise.

8              And I think I'll turn it over now to my colleague

9    Steve Ross from California, who will talk a little bit about

10   possession, custody and control.

11             THE COURT:  Thanks.

12             Mr. Ross.

13             MR. ROSS:  Thank you, your Honor.  Your Honor, the

14   only thing that I want to repeat that Mr. Miller said is that

15   there was no concession, as Ms. Sheth said earlier, about the

16   relevancy of any of Novartis's document requests.  What we did

17   we did in the spirit of compromise in the hope that we wouldn't

18   find ourselves here.

19             But what we did was we limited our search to the

20   issues relevant to the case, Exjade and the Medicaid system

21   because as Mr. Miller said this case is about, from the states'

22   point of view, the Medicaid system and the damage or the injury

23   that the states' Medicaid systems sustained as a result of the

24   kickback scheme.

25             One of the points that Novartis is trying to make here

1  is that we as -- and I'm not sure what she's -- what she means,

2  but we as either the Attorney Generals of the various states or

3  the single state agencies, or the states themselves, are able

4  to somehow reach into, excuse me, reach into the files of

5  sister agencies in the state and produce documents, or obtain

6  documents or control documents.  We don't have the ability to

7  do that, and the law says that we don't have to do that.  In

8  fact, I think the leading case which is a New York case, the

9  Boardman case, which I know we dealt with in the state's

10  objections to the pending motion, said that -- the Court said

11  very specifically, there is a presumption that separate

12  governmental agencies under state law will not be aggregated

13  together without the showing of much more.  It doesn't matter

14  whether the particular plaintiff in a particular case is an

15  agency like the Department of Transportation in the Boardman

16  case, or the state itself as in the Lokear case in California

17  which stands for the same proposition.  In fact, the Boardman

18  case went on to say at page 266, that if you followed the

19  defendant's argument, in other words, that the state can reach

20  into any sister agency to produce documents -- if you follow

21  that argument to a logical conclusion, any lawsuit brought by

22  the State of New York would subject all 22 executive agencies,

23  et cetera, et cetera, to discovery.  The Court could easily

24  have said any lawsuit brought by a particular agency would open

25  up any other agency, any other agency's files.  The Court

1    didn't say that.  It said the State of New York.  So it doesn't

2    matter, for purposes of this issue, discovery issue, whether

3    it's the state that's the party in interest or whether it's the

4    single state agency that's the party in interest.  And we've

5    conveyed that to Novartis; that for purposes of this issue,

6    because of the loss, particularly in Boardman it just doesn't

7    matter.  Boardman says there's a presumption that you don't

8    aggregate a sister state agencies without much more.  The much

9    more is the burden that Novartis has in this case.  If they

10   want us, as either the Attorneys General or the single state

11   agency to go into a sister state agency and look for documents,

12   they have to meet their burden to show this Court that we, in

13   fact, have the ability to do that.

14       THE COURT:  Well, Ms. Sheth says she's met that burden

15   by pointing you to the regulations that provide you with the

16   ability to audit.

17       MR. ROSS:  I understand that.  And those regulations

18   are very limited in scope.  Those regulations relate to the

19   Medicaid, program.  They allows us to go into and audit, but it

20   relates to the Medicaid program.  The requests that Novartis is

21   asking the states for are not limited in any way to the

22   Medicaid program.  We don't have the ability to oversee or

23   investigate any sister state agency for any conduct other than

24   perhaps conduct directly related to the Medicaid program.

25   That's not what they asked for.

Eb4zusam                    Motion

1          You know, we tried to compromise with them on those

2     issues, but they refuse.  Their requests are so broad and go so

3     far beyond just the Medicaid system, that it's not possible to

4     respond in an intelligent and reasonable way, the way the

5     requests on this motion are drafted.

6          THE COURT:  I'm not sure I understand the significance

7     of saying that the authority is limited to the Medicaid system.

8     If the claim here is based on the fact that the Medicaid system

9     is being defrauded by Novartis, why isn't the information that

10    she's seeking related to the Medicaid system?

11         MR. ROSS:  Well, first of all, if Medicaid wasn't

12    paying for it, for example, if it wasn't something that had to

13    do with Medicaid population, it wouldn't have anything to do

14    with this particular action.  The program may have nothing --

15    the programs of these sister agencies may have absolutely

16    nothing to do with anything that goes on in the Medicaid

17    system.  It may be a program that the Medicaid system doesn't

18    have.  I don't know at this point.  You know, we don't control

19    those other agencies or the documents they have.  I think the

20    burden is on -- the point I'm trying to make is the burden is

21    on Novartis to show that we would have some custody or control

22    over particular types of documents, in particular sister

23    agencies, and they haven't met that burden.

24         THE COURT:  Thank you.

25         MR. ROSS:  Thank you.

1          THE COURT:  Let me see if anyone who has joined us

2    telephonically would like to weigh in.  And what I will do is

3    go down my list and ask you if you would like to add anything.

4          For the State of Georgia, Ms. White?

5          MS. WHITE:  No.  Thank you, your Honor.

6          THE COURT:  Illinois, Ms. Hamilton?

7          MS. HAMILTON:  No.  Thank you, your Honor.

8          THE COURT:  Indiana, Mr. Carcare.

9          MR. CARCARE:  Your Honor, the only thing I would like

10   to add to the argument is that Ms. Sheth had argued that there

11   was a very limited group of entities.  With respect to the

12   Indiana, one of the entities that Ms. Sheth's client has been

13   asking documents for is the Indiana University Hospital, which

14   is a private corporation.  So your Honor's argument that the

15   logical extension of Ms. Sheth's argument is that the discovery

16   would be seeking information from actual providers other than

17   the state, is borne out by the very fact that they've asked for

18   information from the Indiana University Medical System.

19         THE COURT:  Thank you.

20         Mr. Dykes, from the State of Maryland?

21         MR. DYKES:  No, your Honor, I don't have anything

22   additional to add.  Thank you.

23         THE COURT:  Thank you.

24         Mr. Robinson for Oklahoma?

25         MR. ROBINSON:  Your Honor, like Indiana, the hospital

 1  Novartis is seeking discovery from are private corporations.

 2               THE COURT:  Thank you.

 3               Ms. Wilson from Wisconsin?

 4               MS. WILSON:  I have nothing to add, your Honor.  Thank

 5  you?

 6               THE COURT:  And Ms. Bashaw for State of Washington?

 7               MS. BASHAW:  Washington's fine, your Honor.  Thank

 8  you.

 9               THE COURT:  Thank you.

10               Ms. Sheth, you have some rebuttal?

11               MS. SHETH:  Thank you, your Honor.  I will be brief.

12               Let me begin just with the point about Judge McMahon's

13  decision.  That decision, as your Honor knows, was based on the

14  pleadings.  The judge did not rule that Novartis violated the

15  antikickback statute, but rather merely ruled that based on

16  what the government has alleged in the complaints, accepting

17  those allegations as true, they had sufficiently pled a cause

18  of action under the FCA based on the predicate AKS violation.

19               THE COURT:  But isn't one of the significant things

20  about her decision the extent to which she limits the

21  complaint; that is, her interpretation the antikickback

22  allegations may well serve to limit the discovery by rendering

23  at least some of what the government has included as fluff?

24               MS. SHETH:  Well, it is interesting that, you know,

25  the government, what we heard today from the government is very

1   interesting.  Because -- well, one, if we look at the

2   allegations in their complaint they're not consistent with what

3   we heard today.

4           But I think what is very significant is that after

5   Judge McMahon's decision came out, the government issued

6   several subpoenas to the specialty pharmacies.  And one of the

7   categories of documents that the government requested in those

8   subpoenas was communications between the specialty pharmacy and

9   physicians relating to CellCept, Myfortic and switches of

10  patients from CellCept to Myfortic.

11          And, in addition to that, they also requested

12  documents that show the identity of the specialty pharmacy

13  personnel and the physicians involved.

14          So given that, they're still serving discovery

15  requests that go to this issue about whether the -- what were

16  the communications, are the communications pretext or not.  And

17  I think with regard to Judge McMahon's decision, she was really

18  ruling on the issue of causation.  So Novartis in its briefing

19  on the motion to dismiss had argued that the government must

20  show some causal link between the inducement provided to the

21  SP, the specialty pharmacy, and that pharmacy's then influence

22  on the physician, and did that physician write the prescription

23  based on what they heard from the specialty pharmacy or for

24  other independent clinical reasons.  And we said -- we had

25  argued that that should be -- they have to show that there's

 1   some causal link in that chain which ultimately led to the

 2   submission of a false claim.  The Judge rejected that argument

 3   which really went to this causation issue.  I don't think that

 4   she ruled on what is the proper parameter of an antikickback

 5   statute violation, specifically with regard to what constitutes

 6   remuneration, what constitutes recommendation and what

 7   constitutes promotion of the Novartis products.

 8          THE COURT:  Well, let's go back to Mr. Yu's point on

 9   that.  How does any of the discovery that you've requested

10   illuminate what sounds like statutory terms?

11          MS. SHETH:  Right.  And so Mr. Yu definitely makes

12   that argument.  And I think the words in the statute have to be

13   informed by the facts.  And if we look at the actual policy

14   rationale of the antikickback statute, it's based on avoiding

15   over utilization of products and services.  It's intended to

16   avoid patient harm, and it's intended to avoid improper

17   influence or corruption of healthcare providers clinical

18   judgment.  And if you look at the Government's complaint, those

19   allegations in the complaint bring these issues squarely into

20   play.  And I will just read several sentences from the

21   Government's complaint that reflect this.  If we look at

22   paragraph 227 of the second amended complaint of the U.S.

23   Attorney's Office, the first sentence of paragraph 227;

24   "Further as Novartis and BioScrip were aware, the calls from

25   BioScrip did not provide Exjade patients with unbiased clinical

1   information.  Instead, and unbeknownst to the patients, those

2   calls emphasized the benefits of getting refills and down

3   played the significance of Exjade's side effects."

4            And even Mr. Yu's presentation today when he was

5   talking about Bryant's, talked about the actual conversation

6   between Bryant's and Novartis and the SP -- excuse me --

7   between Bryant's and the physician relating to clinical

8   benefits of Myfortic, and are these appropriate clinical,

9   clinically supported benefits or are they simply pretext.

10           With regard to Exjade, if we look at paragraph 274 of

11  the Government's complaint, they allege these recommendations

12  to patients to order refills or to restart Exjade therapy,

13  however, were not based on independent clinical assessments of

14  whether a refill or restarting Exjade therapy was needed or

15  clinically appropriate.

16           They also in their complaint challenge how Novartis

17  measured adherence.  Novartis used refill rates.  At paragraph

18  286, the government contends that the refill is not an

19  appropriate measure of adherence and, rather, they should be

20  looking at how many patients were actually adhering to the

21  medication as prescribed by the physicians.

22           And even if we look at the Government's own statements

23  of its representatives at various hearings.  For example, at

24  the March 14th hearing in front of Judge McMahon, the

25  government stated, "Because of the way the recommendations were

Eb4zusam                         Motion

1    made, they were made under the pretext of certain clinical

2    justifications, and the result was, in many cases, that

3    patients were switched from a competing drug to Myfortic."

4          With regard to Exjade, there was another statement

5    that the Exjade scheme was really a matter of corrupting the

6    medical judgment of the pharmacy.  BioScrip was just pushing

7    the drug on patients without knowing the precise medical

8    conditions that the patients had.

9          You know, so these statements and allegations in their

10   complaint really put these issues squarely in dispute, and we

11   need to be able to have the discovery that allows us to show

12   that what we were doing was not corrupting the physician

13   judgment.  We were providing truthful, accurate, clinically

14   supported information.  We were not engaged in inappropriate

15   sales oriented activities or promotions or recommendations, but

16   rather completely valid and appropriate education and

17   counselling activities.

18         Now, what the government -- their views on what an

19   appropriate adherence program is, would shed light on these

20   various legal elements which go to inform the plain language

21   used in the statute.

22         Now, the government also argues that Novartis has to

23   be aware of and has to rely on these specific adherence

24   documents in order to make them relevant.  But what they miss

25   is that we have two statutes at issue here.  We have the False

Eb4zusam                          Motion

1    Claims Act, which has a knowing intent element, and we also

2    have the antikickback statute which has both a knowing and a

3    willfulness intent element.

4         And the wilfulness is key here.  Because part of the

5    definition of wilfulness is, under the AKS is whether the

6    conduct is so obviously evil, so inevitably nefarious, so

7    inherently bad that no one -- that everybody would have known

8    that this conduct is prohibited.  And the government cites to

9    three cases in their papers, the Prabhu case, the BankAtlantic

10   case and the Elsass case.  None of those cases involve the

11   question about wilfulness under the antikickback statute.  And

12   in fact Prabhu involves the knowingness, knowingly standard

13   under the FCA, whereas Bankatlantic and Elsass involve two

14   completely different statutes.  And so this discovery is

15   relevant to whether or not Novartis's interpretation, that

16   Novartis's understanding that its activities were lawful, they

17   were not prohibited under the antikickback statute is a

18   reasonable understanding, that its conduct was appropriate

19   under the statute.

20        Now, I mean, given that we were surprised to hear sort

21   of how sterile the government expects its case to be, I mean if

22   the government is willing to concede to strike some of those

23   allegations that I reference in its complaint, then that

24   certainly will change what is relevant in this case.  And if

25   they're going to proceed strictly on a disclosure theory, I

1   think that would be good to know.

2              You know, just what we've heard so far is here's what

3   they have put in their complaint, here's what they've argued at

4   the various hearings.  And even today we're hearing that it is

5   still -- they're still putting into issue these communications

6   between the specialty pharmacy and the various healthcare

7   providers.

8              THE COURT:  Well, there is a difference, is there not,

9   between that which they will have to prove in order to make

10  their case and that which they want to expose to the public?

11             MS. SHETH:  That may be true.  But if they're going to

12  put these -- if they're going to put on proof of these

13  allegations as part of the effort to describe the overall

14  scheme that they're alleging with regard to Myfortic on the one

15  hand and Exjade on the other, and if they're going to put in

16  evidence at trial that goes to describe this overall scheme,

17  how the scheme operated, how Novartis corrupted the clinical

18  judgment of both specialty pharmacies and healthcare providers,

19  then we need to be able to respond and say, no, actually what

20  we were doing was just simply providing truthful, accurate

21  information, and look at what the government itself views as

22  truthful, accurate information.  So that, you know, it is

23  certainly relevant to establishing one of our defenses.

24             Turning just quickly to the state's arguments.  Again,

25  the state actually relies pretty heavily on the Boardman case.

1    But that case, one, is from the Northern District of New York.

2    But more importantly it can be distinguished on three very

3    significant bases.  First, in that case the Court found that

4    the true plaintiff was actually the Department of

5    Transportation and that the State of New York was just a

6    nominal party.  That's very distinguishable than what we have

7    here.  Here the caption is brought by the -- mentions the

8    various states.  The allegations in the complaint mention that

9    the states are the damaged party.  And so here we have the

10   plaintiff as the state, not a specific agency within the state.

11          Second, the Court's decision in Boardman was

12   focused -- relied very specifically on provisions within the

13   New York Constitution, which found that both the comptroller

14   and the Office of the State comptroller was totally autonomous

15   from the Governor and the rest of the executive.  So there's

16   very specific constitutional language that the court relied on

17   to hold that those two entities, the Department of

18   Transportation on the one hand, and the Office of the State

19   Comptroller were two different entities, and that the

20   Department of Transportation did not have access or the

21   practical ability to obtain documents from the Office of the

22   State Comptroller.

23          And, third, which is really the critical point, is

24   that in that case the Court distinguished the case that

25   Novartis cited, which is the De Campagne Francois Phillips

Eb4zusam                        Motion

1    Petroleum Case, which is from the Southern District, but

2    recognized that the key issue was whether or not the state --

3    would have to -- the key issue in deciding whether or not the

4    state would have to produce documents was whether the state had

5    possession, custody and control of those documents, and the

6    Boardman case recognized that the concept of control is a broad

7    concept, and if a party has the practical access and control

8    over the requested documents that they should be produced.  And

9    that's what we have in this case, where we are showing by

10   virtue of the regulations that the SSA do have the practical

11   ability to get access to those entities, those state entities

12   that administer the Medicaid program.  And even a case that was

13   decided both after Boardman and obviously after the Phillips

14   Petroleum case, this is the Gear v. Skelly case also notes that

15   Boardman, the Boardman distinguishing concept of control is

16   still applicable today.  And in that case the Court ordered

17   that documents should be produced from a non-party -- in that

18   case it was the Department of Corrections -- because the

19   Department of Corrections was sufficiently closely coordinated

20   to the party at issue, such that it had the practical ability

21   to obtain those documents.

22            So I think the Boardman case can be distinguished on a

23   number of grounds, but it still stands for the fundamental

24   principle that the state has the practical ability to get

25   documents from the state, the single state SSAs, and those SSAs

Eb4zusam                         Motion

1    have the ability to get documents from those entities who are

2    involved in the administration of the Medicaid program.

3           And then finally as to the state's burden argument.

4    From the presentation, it sounded like there was some ambiguity

5    about whether certain agencies have control -- whether the

6    state has control over the documents of certain agencies.  And

7    we heard today for the first time that, you know, there are

8    some hospitals that where they may not have control.  So, you

9    know, if the state is willing to engage with us on that topic,

10   we can certainly work with them to limit which agencies they

11   actually have control over and limit the request to getting

12   documents from those agencies.

13          THE COURT:  Well, but your argument is based on the

14   regulations, right?  I mean, you don't care what their

15   relationship is outside of those regulations?

16          MS. SHETH:  That is true.  And it was our

17   understanding that those hospitals that we had identified were

18   state hospitals.  But if we are now hearing that those are

19   actually private hospitals and are not involved in the

20   administration of the Medicaid program, then we accept those

21   representations.

22          THE COURT:  Okay.  Thank you.

23          MS. SHETH:  Thank you, your Honor.

24          THE COURT:  Mr. Yu, one last shot.

25          MR. YU:  Yes, your Honor.  Bear with me, your Honor,

1    just very briefly.  I mean, there are just a few things Ms.

2    Sheth brought up that were not mentioned previously.

3              First, the government subpoenas to additional

4    pharmacies, so just to be clear.  So the complaint the

5    government refers to five specific pharmacies that were

6    investigated as part of the investigation.  The government as

7    part of the Myfortic case, relationship between the other

8    pharmacies which were not, by virtue of the limitation of the

9    seal period, the government didn't have a chance to investigate

10   as carefully.  And what we are asking for those communications,

11   those are the very recommendations that we -- are the core of

12   the, what we -- what may be the kickback violation, if a

13   pharmacy was sending communications to a prescriber in the

14   Myfortic case telling prescriber to switch patients, having

15   prescribers switch patients from CellCept, generic to Myfortic.

16   That is a recommendation that we believe gave rise to

17   antikickback statute -- that gives rise to an antikickback

18   statute violation and, therefore, there is absolutely nothing

19   inconsistent between seeking those types of communications and

20   the position the government is taking in this case about

21   relevance.

22             I mean, as far as, you know, Ms. Sheth also mentioned

23   concept of wilfulness or this aspect of wilfulness under the

24   antikickback statute.  Just very briefly, your Honor.  You

25   know, Novartis position seems to be that somehow the

1    government -- what the government which itself is not subject

2    to antikickback statute, may have done which Novartis didn't

3    know about somehow could retroactively render Novartis's belief

4    or its conduct reasonable.  I mean, even though the -- in that

5    regard, even though the Prabhu case, which is doesn't involve

6    the antikickback statute, but does involve a fraud claim and

7    does -- is very much on point, basically says you cannot as a

8    defendant or a defendant cannot try to manufacture reasonable

9    belief or try to manufacture ambiguity after the fact.  And so

10   given that Novartis didn't know, doesn't claim to be basing its

11   conduct on what the government did, and given that in any event

12   the government itself is not subject to this statute, for

13   Novartis to assert that somehow what the government did or may

14   be doing is relevant to the reasonableness of this conduct,

15   that we simply disagree with.

16          And in terms of what the government would need to

17   prove at trial, your Honor, again, just to reiterate we don't

18   believe that -- or rather our case is not about medical

19   appropriateness or medical necessity, so that's not part of the

20   Government's burden at trial.  But ultimately there will need

21   to be some amount of medical or clinical information simply by

22   way of waive background or to show that the inducement

23   relationship occurred as sufficient to give rise to a kickback

24   liability.  But that's a very different proposition from saying

25   that the government has to prove any specific instance or more

Eb4zusam                        Motion

1   generally what happened was factually or objectively

2   inappropriate.

3          If the Court has no further questions?

4          THE COURT:  Thank you.

5          Do the states rest?

6          MR. MILLER:  I think we do, your Honor.

7          THE COURT:  Thank you all.  It's been very helpful.

8          MS. SHETH:  Thank you, your Honor.

9          MR. YU:  Thank you, your Honor.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25